UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DENNIS AMRHEIN | § | |
| | § | **CIVIL ACTION NO. 1:22-cv-00076** |
| **Plaintiff** | § | |
| | § | |
| VS. | § | |
| | § | |
| ISLAMIC REPUBLIC OF IRAN | § | |
| | § | |
| **Defendant** | § | |

## MOTION FOR DEFAULT JUDGMENT

Submitted by:

R. Bruce Tharpe
**LAW OFFICE OF**
**R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................4-6

PREAMBLE ............................................................................................................... 7

I. STATEMENT OF CLAIM ....................................................................................... 7

II. LEGAL STANDARDS FOR ENTRY OF DEFAULT JUDGMENT AGAINST
    FOREIGN SOVEREIGN DEFENDANTS ....................................................... 8

  A. The Standards as to the Type and Quantum of Evidence Required for Default
     Judgments are Less Rigorous than those Required in Contested Cases ....................... 9

III. THE COURT HAS SUBJECT MATTER AND PERSONAL JURISDICTION
     OVER THIS ACTION AND THE PLAINTIFF ESTABLISHES THE
     ELEMENTS OF HIS CLAIM ....................................................................... 11

  B. Standards for Subject Matter Jurisdiction ..................................................... 11

  C. Terrorism Exception Applies to Iran………………………………………….............. 12

IV. IRAN PROVIDED AL QAEDA WITH THE MATERIAL SUPPORT AND
    RESOURCES FOR THE TERRORIST ATTACKS .................................................... 16

V. IRAN ACTED THROUGH ITS OFFICIALS, EMPLOYEES, OR AGENTS WHO
   WERE ACTING WITHIN THE SCOPE OF THEIR OFFICES, EMPLOYMENT,
   OR AGENCIES……………………………………………………………………….. 21

VI. IRANIAN MATERIAL SUPPORT AND RESOURCES PROVIDED TO
    AL QAEDA CAUSED THE PLAINTIFF'S INJURIES AND DAMAGES ................ 23

VII. IRAN'S SUPPORT OF AL QAEDA ESTABLISHES LIABILITY IN THE
     INSTANT CASE…………………………………………………………………... 25

VIII. PLAINTIFF'S SUBSTANTIVE CLAIMS AGAINST IRAN. .................................. 27

IX. PLAINTIFF'S REQUESTED DAMAGES ...................................................................... 28

    D. Federal Precedent for Damages Due to Terrorist Attacks ............................................ 28

    E. State Precedent for Personal Injury (TBI) ................................................................... 28

    F. Plaintiff's Requested Compensatory Damages ............................................................ 30

PRAYER ........................................................................................................................... 31

# TABLE OF AUTHORITIES

*Abelesz v. Magyar Nemzeti Bank,*
  692 F.3d 661, 694 (7th Cir. 2012) ................................................................................ .. 26

*Acosta v. Islamic Republic of Iran,*
  574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) ……………………………………………… 25

*Argentine Republic v. Amerada Hess Shipping Corp.,*
  488 U.S. 428, 434 (1989) …………………………………………………………….... 11

*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) …………………………………………….... 25

*Ben-Rafael v. Islamic Republic of Iran,*
  540 F. Supp. 2d 39, 54 (D.D.C. 2008) ……………………………………………….... 23

*Bluth v. Islamic Republic of Iran,*
  203 F. Supp 3d 1, 17 (D.D.C. 2016)……………………………………………………10

*Bodoff v. Islamic Republic of Iran,*
  424 F.Supp.2d 74, 84 (D.D.C. 2006)............................................................................ .. 25

*Boim v. Holy Land Foundation for Relief and Development,*
  596 F.3d 685, 695-698 (7th Cir. 2008) ……………………………………………….. 24

*Braun v. Islamic Republic of Iran,*
  228 F. Supp. 3d 64, 84 (D.D.C. 2018)…………………………………………….......... 28

*Commercial Bank of Kuwait v. Rafidain Bank,*
  15 F.3d 238, 242 (2d Cir. 1994)…………………………………………………… 10, 31

*Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion,*
  88 F.3d 948, 951 (11th Cir. 1996)…………………………………………………….… 9

*Dammarell, et al. v. Islamic Republic of Iran, et al.,*
  Civ. A. No. 01-2224(JDB), 2006 U.S. Dist. LEXIS 63263 (D.D.C. 2006 Sept. 7, 2006).. 28

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,*
  894 F.3d 339, 346 (D.C. Cir. 2018) …………………………………………………... 23

*Espitia, et. al., v. Islamic Republic of Iran,*
  1:21-CV-123, USDC, Southern District of Texas ……………………………………… 28

*Estate of Doe v. Islamic Republic of Iran,*
  808 F. Supp. 2d 1, 7 (D.D.C. 2011) ……………………………………………………10

*Flatow v. Islamic Republic of Iran,*
   999 F. Supp. 1, 27 (D.D.C. 1998))................................................................ .. 25, 27

*Foley v. Syrian Arab Republic,*
   249 F. Supp. 3d 186, 205 (D.D.C. 2017)........................................................ 27

*Fritz v. Islamic Republic of Iran,*
   2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018) ............................................. .. 27

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic,*
   582 F.3d 393, 399 (2d Cir. 2009) ……………………………………………... 26

*GDG Acquisitions LLC v. Gov't of Belize,*
   849 F.3d 1299, 1305 (11th Cir. 2017) ……………………………………… 11

*Han Kim v. Democratic People's Republic of Korea,*
   774 F.3d 1044, 1048-51 (D.C. Cir. 2014) …………………………………….. 10

*Heiser v. Islamic Republic of Iran,*
   466 F. Supp. 2d 229, 269 (D.D.C. 2006)................................................. …... 28

*Hekmati v. Islamic Republic of Iran,*
   278 F. Supp. 3d 145, 157 (D.D.C. 2017) …………………………………… 8

*Herrick, et. al., v. Islamic Republic of Iran,*
   1:21-CV-168, USDC, Southern District of Texas ………………………………. 28

*Karcher v. Islamic Republic of Iran,*
   1:16-CV-232, USDC for the District of Columbia ………………………………... 22

*Kilburn v. Islamic Republic of Iran,*
   699 F. Supp. 2d 136, 150 (D.D.C. 2010) …………………………………… 11

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
   376 F.3d 1123, 1128-29 (D.C. Cir. 2004) …………………………………... 23

*Menchaca v. National Trampoline Entertainment Center,*
   334th District Court of Harris County, Texas, No. 201407366 (dec'd 2/26/2016) …… 29-30

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.,*
   863 F.3d 96 (2d Cir. 2017) ……………………………………………………. 26

*Cindy Montoya v. Billy Duane Williams and Advanced Simulation Technologies, Inc.,*
   70th District Court of Ector County, Texas, No. A-134,684 (dec'd 2/4/2015) …………... 29

*Mwani v. Bin Laden,*
   417 F.3d 1, 6 (D.C. Cir. 2005) …………………………………………………….. 8

*Owens v. Republic of Sudan,*
   864 F.3d 751, 788 (D.C. Cir. 2017)……………………………………... 9-11, 13, 23-24

*People's Mojahedin Org. of Iran v. United States Dep't of State,*
   182 F.3d 17, 22 (D.C. Cir. 1999) …………………………………………… 26

*Price v. Socialist People's Libyan Arab Jamahiriya,*
   294 F.3d 82, 87 (D.C. Cir. 2002) ………………………………………... 26

*Roeder v. Islamic Republic of Iran,*
   333 F.3d 228, 232 (D.C. Cir. 2003) ……………………………………………… 9

*Roth v. Islamic Republic of Iran,*
   78 F. Supp. 3d 379, 386 (D.D.C. 2015) …………………………………………... 10

*Rux v. Republic of Sudan,*
   461 F.3d 461, 473 (4th Cir. 2006) ……………………………………………… 23

*S & Davis Int'l, Inc. v. Yemen,*
   218 F.3d 1292 (11th Cir. 2000)…………………………………………………... 26

*Stansell v. Revolutionary Armed Forces of Colom. (FARC),*
   No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. 2010) ………. 10

*Thuneibat v. Syrian Arab Republic,*
   167 F. Supp. 3d 22, 33 (D.D.C. 2016) ……………………………………………….. 8

*TracFone Wireless v. Anadisk LLC,*
   685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010) ………………………………………….. 8

*Valore v. Islamic Republic of Iran,*
   700 F. Supp. 2d 52, 66 (D.D.C. 2010)…….…………………………………………… 23, 28

*Vermeulen v. Renault, U.S.A., Inc.,*
   985 F.2d 1534, 1553 (11th Cir. 1993) …………………………………………... 26

*West Star Transportation Inc. v. Charles and Cherie Robinson,*
   Court of Appeals, Seventh District of Texas, No. 07-13-00109-CV (dec'd 1/23/15) ….. 29

*White, et. al., v. Islamic Republic of Iran,*
   1:21-CV-86, USDC, Southern District of Texas …………………………………... 28

TO THE U.S. DISTRICT JUDGE:

**COMES NOW**, Plaintiff Dennis Amrhein and respectfully asks the District Court to issue a Default Judgment against Defendant Islamic Republic of Iran in accordance with Rule 55(b). The Defendant was served the lawsuit under the procedures noted by the FRCP. As of the current date, Defendant did not file an answer, a response, a dispositive motion, or otherwise defend or dispute the instant case and issues in controversy.

Plaintiff shows the Court as follows:

## I. STATEMENT OF CLAIM

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, the Antiterrorism Act, 18 U.S.C. § 2333, and supplemental causes of action, seeking damages for personal injury and related torts, arising from multiple terrorist attacks incurred by Plaintiff Dennis Amrhein from July 2005 to March 2006 in areas of Iraq, including Ramadi, Iraq, in which the Plaintiff was severely injured (the "Terrorist Attacks"). These attacks were planned by al Qaeda terrorists with material support, weapons, training, and funding from Defendant Islamic Republic of Iran.

2.      Plaintiff Dennis Amrhein is currently a Pennsylvania resident and was an active-duty Army soldier at the time of the allegations giving rise to this cause of action. Plaintiff was deployed as an 11 Bravo infantry soldier in a long-range scout and sniper platoon from Brigade Combat Team 2-28, assigned to various areas of Iraq to provide security and intelligence collection in support of the Iraqi Provisional Authority (IPA), and to conduct surveillance, apprehension and deterrence of terrorist suspects.

During his deployment as an Army infantry soldier and reconnaissance scout in

Iraq from February 2005 to July 2006, Plaintiff was injured when he and his team were hit with multiple improvised explosive device (IED) blasts as they were conducting peacekeeping operations in support of the IPA. These IEDs were built in Iran and designed to maim, kill, murder, and destroy U.S. military personnel in their armored vehicles.

3. Defendant the Islamic Republic of Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603 and designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Iran provided material support and resources for the commission of attempted acts of extrajudicial killing within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks, authorized and ratified the actions of its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attacks and the harm to the Plaintiff.

## II. LEGAL STANDARDS FOR ENTRY OF DEFAULT JUDGMENT AGAINST FOREIGN SOVEREIGN DEFENDANTS

4. The entry of default judgment is governed by Fed. R. Civ. P. 55. Despite a defendant's refusal to respond to the complaint, "the entry of a default judgment is not automatic." *See Mwani v. Bin Laden,* 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, a plaintiff seeking a default judgment must establish both subject matter and personal jurisdiction. *See e.g., TracFone Wireless v. Anadisk LLC,* 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010); *Hekmati v. Islamic Republic of Iran,* 278 F. Supp. 3d 145, 157 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

5.     Additionally, under the Foreign Sovereign Immunities Act (FSIA), plaintiffs must also prove their claims or right to relief by proffering evidence that is "satisfactory to the court." 28 U.S.C. § 1608(e); *See Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir. 1996); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.")

6.     Plaintiff submits exhibits and his verified declaration based on his knowledge of relevant facts and circumstances surrounding the events giving rise to this action to establish the Defendant's liability.

A.     <u>The Standards as to the Type and Quantum of Evidence Required for Default Judgments are Less Rigorous than those Required in Contested Cases</u>.

7.     The FSIA requires plaintiffs seeking a default judgment against a foreign state to establish their claims "by evidence satisfactory to the court." 28 U.S.C. §1608(e). Section 1608(e), however, does not provide guidance as to the type or quantum of evidence that is deemed "satisfactory to the court." Notwithstanding the statutory void, courts are to be guided by established principles found in caselaw.

8.     First, neither § 1608(e) nor any other provision of the FSIA requires a court to base its decision upon a particular type of admissible evidence. *See Owens v. Republic of Sudan,* 864 F.3d 751, 788 (D.C. Cir. 2017). For example, in *Owens* the D.C. Circuit held that expert testimony, regardless of its form or type, is admissible to prove ultimate facts, and that such expert testimony, standing alone, may satisfy the evidentiary burden of §1608(e). The *Owens* court added that eyewitness testimony or other direct evidence are not necessary. *Id.* at 789.

Additionally, district courts have "an unusual degree of discretion over evidentiary rulings" in FSIA cases against a defaulting state sponsor of terrorism. *Id.* at 785. Because state sponsors of terrorism severely restrict the flow of information, including sources of admissible evidence, courts have allowed plaintiffs to prove their claims using evidence that might not be admissible at trial. *Id.,* citing *Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1048-51 (D.C. Cir. 2014). A plaintiff may not, however, rely exclusively upon inadmissible evidence. *Owens,* 864 F.3d at 785.

9.      Second, § 1608(e) does not require a district court to conduct an evidentiary hearing so long as the plaintiff's allegations are supported by the evidence. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994). Plaintiffs may carry their burden of production through the submission of documentary evidence including affidavits and declarations. *Id.; Estate of Doe v. Islamic Republic of Iran,* 808 F. Supp. 2d 1, 7 (D.D.C. 2011); *see also, Bluth v. Islamic Republic of Iran,* 203 F. Supp 3d 1, 17 (D.D.C. 2016); *Stansell v. Revolutionary Armed Forces of Colom. (FARC),* No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. 2010) (court may forego a hearing where the plaintiffs submit detailed affidavits describing the nature and extent of their damages). Moreover, "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *See Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 386 (D.D.C. 2015).

10.      Finally, the quantum of evidence required for entry of summary judgment under § 1608(e) is the same as that required to defeat a defendant's motion for summary judgment. "To prevail in an FSIA default proceeding, the plaintiffs must present a legally

sufficient *prima facie* case, in other words, a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff." *See Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 150 (D.D.C. 2010). The plaintiff need only present enough evidence "to satisfy the judge that her claim has some factual basis." *Owens,* 864 F.3d at 785. Thus, under section 1608(e) the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens,* 864 F.3d at 785.

### III. THE COURT HAS SUBJECT MATTER AND PERSONAL JURISDICTION OVER THIS ACTION AND THE PLAINTIFF HAS ESTABLISHED THE ELEMENTS OF HIS CLAIM

B. Standards for Subject Matter Jurisdiction

11.     28 U.S.C. 1330(a) provides district courts with subject matter jurisdiction over any non-jury civil action against a foreign state as to any claim for relief for which the foreign state is not immune under the FSIA. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989); *GDG Acquisitions LLC v. Gov't of Belize,* 849 F.3d 1299, 1305 (11th Cir. 2017). Thus, subject matter jurisdiction lies only where the plaintiffs establish the applicability of a statutory exception to the foreign state defendant's immunity. *See* 28 U.S.C. §§ 1604-1607.

12.     The Court has subject matter jurisdiction over Defendant Iran under the terrorism exception to foreign sovereign immunity, which provides in part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

> *See* 28 U.S.C. § 1605A(a)(1).

13.     In the instant case, these elements are all satisfied. The Plaintiff seeks money damages against Iran for personal injuries that were caused by Iran's provision of material support and resources for the attempted extrajudicial killing of Plaintiff Dennis Amrhein.

C.  The Terrorism Exception Applies to Iran

14.     The terrorism exception allows claims to be heard only against foreign states that were designated as state sponsors of terrorism at the time of the act of terrorism and that remain so designated. *See* 28 U.S.C. § 1605A(a)(2). The term "state sponsor of terrorism" refers to countries, the governments of which have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism. *See* 28 U.S.C. § 1605A(h)(6). Iran is presently designated a state sponsor of terrorism and has been so designated since 1984.[1] *See* **Exhibit 1.**

15.     The Terrorist Attacks on Dennis Amrhein were an attempted extrajudicial killing. Iran provided material support and resources to al Qaeda for the commission of acts of extrajudicial killing, including the attacks on Dennis Amrhein. *See Original Complaint,* pages 17-21, items 57-72. Section 1605A adopts the definition of "extrajudicial killing" that is codified in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "extrajudicial killing to mean:

> "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."

> *See* 28 U.S.C. § 1350.

---

[1] *See* U.S. Department of State Country Reports on Terrorism 2019, see also 31 CFR § 596.201.

16.     "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens,* 864 F.3d at 770. The Terrorist Attacks on Dennis Amrhein satisfy all three elements, and "does not fall within the exception for killings carried out under the authority of a foreign nation acting in accord with international law." *See id.*

17.     Plaintiff notes that he survived the attacks; however, he suffers from multiple permanent and debilitating conditions for which he seeks compensatory damages. Furthermore, Iran's liability is established under 28 U.S.C. § 1605A(a)(1), as Defendant provided material support and resources for the attacks. *See* **Exhibits 1-9.**

18.     Abu Musab Al-Zarqawi was a Jordanian jihadist who ran a terrorist training camp in Afghanistan. He became known after going to Iraq in 2002 and organizing a series of bombings, beheadings, and attacks during the Iraq War, turning an insurgency against U.S. troops in Iraq into a Shia-Sunni civil war. He was also known as 'Sheikh of the Slaughterers'. *See* Weiss, Michael; Hassan, Hassan (2015), "Sheikh of the Slaughterers," <u>ISIS: Inside the Army of Terror</u>, Simon and Schuster.

19.     In late 2004, Al-Zarqawi joined al Qaeda and pledged allegiance to Osama bin Laden. After this, al-Tawhid wal-Jihad became known as Tanzim Qaidat al- Jihad fi Bilad al-Rafidayn, also known as al Qaeda in Iraq (AQI), and al-Zarqawi was given the al Qaeda title "Emir of al Qaeda in the Country of Two Rivers." *See* Chehab, Zaki 2006, <u>Iraq Ablaze: Inside the Insurgency</u>, IB Tauris & Co, Cornwall, p. 8.

20.     In September 2005, Al-Zarqawi declared "all-out war" on Shi'ites in Iraq, after the Iraqi government offensive on insurgents in the Sunni town of Tal Afar. Al- Zarqawi dispatched numerous suicide bombers and IED bombs throughout Iraq to attack

American soldiers and areas with large concentrations of Shia militias. He was also responsible for the 2005 bombing of three hotels in Amman, Jordan. *See Amman Bombings Reflect Zarqawi's Growing Reach,* by Craig Whitlock, The Washington Post, Nov. 13, 2005.

21.     Zarqawi was killed in a targeted strike by a joint U.S. force on June 7, 2006, while attending a meeting in an isolated safehouse in Hibhib, a small village approximately 8 km (5.0 mi) west-northwest of Baqubah.

22.     A year before his death, Zarqawi began to obtain funds from Defendant and through Defendant's ties to al Qaeda, in order to purchase advanced weaponry and smuggle IED bombs and anti-tank shaped charges, capable of destroying U.S. tanks, vehicles, and armored personnel carriers. Tanks were seen as an important tool (used by the Americans) as these military assets are armored, provide crew protection, and can withstand small-arms fire (AK-47s, grenades, RPGs) without damage. The tanks were used by Coalition forces for stability and peacekeeping operations in support of the Provisional Authority and lawful government of Iraq.

23.     Through funding provided by Defendant, Zarqawi had access to large bank accounts and the capability to buy and smuggle from Iran into Iraq custom-made IEDs and shaped-charge munitions (designed to destroy tanks) that were not used by the old or new Iraqi army.

24.     Zarqawi began to purchase these weapons and smuggle them from Iran into Iraq to kill U.S. servicemembers and disable tanks. In fact, U.S. forces captured multiple IEDs that were built in Iran and were being transited into Iraq. These IEDs were explosively formed penetrators (EFPs) that were engineered and built in Iran.

25.     Due to previous U.S. operations that destroyed Iraqi arms depots, Zarqawi needed to obtain newer munitions from Iran. The IEDs used by al Qaeda against Plaintiff Dennis Amrhein were purchased using funds provided by the Defendant and then smuggled from Iran into Iraq.

26.     During his deployment and service as an 11 Bravo infantry soldier and reconnaissance scout in Iraq from February 2005 to July 2006, Plaintiff experienced multiple IED attacks when he was conducting peacekeeping operations and patrolling Ramadi, Iraq, to help stabilize the area against insurgents that were funded and supplied by Iran.

27.     Plaintiff experienced two severe IED attacks, on July 22, 2005 and November 20, 2005, when he and his squad were ambushed by insurgents. Plaintiff was the victim of a third attack when the M1114 up-armored Humvee he was riding in was the target of a roadside IED explosion in March 2006. The explosion disabled the vehicle and was intended to kill the Plaintiff.

28.     Plaintiff was injured by the blast waves and suffered concussive trauma from these IED attacks. Plaintiff was knocked unconscious for several moments by the force of the IED blasts. Plaintiff experienced a concussion, hearing damage, and bruising on his back and limbs.

29.     Mr. Amrhein suffered a traumatic brain injury (TBI), upper back injury, tinnitus, PTSD and other injuries from these attacks.

30.     Al-Zarqawi and al Qaeda were operating in Iraq to kill U.S. forces and destabilize the provisional government. In November 2005, Al-Zarqawi claimed responsibility for multiple attacks on U.S. forces in Iraq and said its military wing

"Downed a Super Cobra attack helicopter in Ramadi with a Strella rocket, thanks be to God." The Associated Press also reported that al Qaeda in Iraq claimed responsibility, noting that it shot down a U.S attack helicopter near Ramadi and killed two U.S. Marines on November 2, 2005. *See* Al-Qaida Says It Shot Down U.S. Helicopter, Killing Two, Associated Press, November 4, 2005, https://www.dailynews.com/2005/11/04/al-qaida-says-it-shot-down-us-helicopter-killing-two (last visited Sep 19, 2019). *See* **Exhibit 2.**

31.     Without Defendant's support, financing, and supervision of al Qaeda, Plaintiff  Dennis Amrhein would not have been attacked and maimed during peacekeeping operations in Iraq between February 2005 and July 2006.

### IV. IRAN PROVIDED AL QAEDA WITH MATERIAL SUPPORT AND RESOURCES FOR THE TERRORIST ATTACKS

32.     After the launch of Operation Enduring Freedom in October 2001 in response to the September 11 attacks, many members of al Qaeda, including Osama bin Laden, fled to the lawless Federally Administered Tribal Areas of Western Pakistan. Key elements of al Qaeda leadership also escaped to Iran, with Iranian authorities' assistance. In late 2001, for example, a senior al Qaeda operative based in Iran, Mustafa Hamid, negotiated with the Iranian government to relocate al Qaeda families to Iran.

33.     In 2003, The Washington Post reported on a "decade-old relationship" between Ayman al-Zawahiri, then al Qaeda's second-in-command, and Ahmad Vahidi, Iran's former Minister of Defense. In 2001, Vahidi reportedly provided "safe harbor for some al-Qaeda leaders who were trapped in the mountains of Tora Bora" following negotiations with al-Zawahiri. According to a European intelligence analyst, "The [Iranian Quds] Force's senior leaders have longstanding ties to al Qaeda, and since the fall of Afghanistan, have provided al Qaeda leaders with travel documents and safe

haven." *See* Iranian Force Has Long Ties to Al Qaeda, The Washington Post, October 13, 2003, https://www.washingtonpost.com/archive/politics/2003/10/14/iranian-force-has-long-ties-to-al-qaeda/35ad4db7-3ff8-47a5-9673-4e1b5788b3b3/ (last visited February 19, 2024).

34.     Under such arrangements, key members of al Qaeda's operational structure came to reside in Iran, including such infamous figures as Saif al-Adel (Security Chief), Saad bin Laden (Osama's son, Senior al Qaeda Operative), Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri, CFO of al Qaeda) and Abu Musab al-Zarqawi (future Chief of al Qaeda in Iraq).

35.     Notionally, Iran held these al Qaeda operatives under "house arrest," but in reality, al Qaeda was using Iran as a base of operations under the protection of the Quds Force. One al Qaeda member noted that there were several stages of restrictions, but in the end, it was "not really house arrest but rather a hospitality." By providing al Qaeda operatives such sanctuary, Iran has been in direct violation of U.N. Security Council Resolution 1390, which prohibits the harboring of al Qaeda members.

36.     Abu Hafs Mauritani, a leading figure of al Qaeda who was in Iran for roughly a decade after 9/11, revealed that al Qaeda members agreed not to carry out attacks from within Iran in exchange for maintaining a safe haven there. Over the next decade, as a means to further its own regional goals, the Iranian regime would permit al Qaeda to use its territory to plan terrorist attacks abroad as well as transit money, arms, and fighters across the region.

37.     Since 2001, Iran has harbored key al Qaeda operatives. After the 9/11 attacks, al Qaeda's operational structure split into two groups – Iran and Pakistan. The

first part of al Qaeda's main operational structure was sent to Iran. This group was led by the head of al Qaeda's Security Committee, Saif al-Adl, and the head of al Qaeda's Training Sub-Section, Abdullah Ahmed Abdullah (alias Abu Muhammad al-Masri). The group also came to include Osama bin Laden's two sons, Hamza and Saad bin Laden.

38.     In its 2010 "Country Reports on Terrorism," the U.S. State Department wrote that "Iran has repeatedly resisted numerous calls to transfer custody of its al Qaeda detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al Qaeda members who fled to Iran following the fall of the Taliban regime in Afghanistan." *See* **Exhibit 3.**

39.     In January 2009, the U.S. Treasury Department froze the assets of four key al Qaeda operatives based in Iran, including Osama bin Laden's eldest son, Saad bin Laden. Regarding the action, former Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, stated, "It is important that Iran give a public accounting of how it is meeting its international obligations to constrain al Qaeda." *See* **Exhibit 4.**

40.     In fact, as reported as far back as 2003, since Saad bin Laden's "arrival in Iran… he has assumed a more active role in directing al Qaeda, and he has been identified as a senior leader." It is believed that Iran allowed Saad to relocate to Pakistan in late 2008.

41.     In March 2010, al Qaeda assisted Iran in negotiating the return of an Iranian diplomat who had been held captive by the Taliban in Pakistan for 15 months. This incident pointed to another dangerous sign of increased Iran-al Qaeda collaboration. In return for its help, Iran provided al Qaeda operatives based in its territory greater freedom of movement and loosened restrictions. As one example, al Qaeda's chief

military strategist, who reportedly now resides in Syria, Saif al-Adel, was allowed by Iran to travel to Pakistan and open more contacts with other al Qaeda leaders.

42.     Reports noted that remaining in Iran while possessing the freedom to travel "suggests that al-Adel and perhaps lower level al Qaeda figures now consider Iran a viable outpost, with fewer restrictions…" Furthermore, the "apparent easing of Iran's restrictions on al Qaeda… now opens up speculation that al-Adel could establish a 'satellite office' for the group in Iran."

43.     In July 2018, a United Nations panel of experts, called the Analytical Support and Sanctions Monitoring Team, appointed pursuant to resolutions 1526 (2004) and 2253 (2015), found that, "al Qaida leaders in the Islamic Republic of Iran have grown more prominent, working with A[y]man al-Zawahiri and projecting his authority more effectively than he could previously." *See* **Exhibit 5.**

44.     In November 2020, Iran's ongoing harboring of al Qaeda operatives was exposed when the New York Times revealed that Abdullah Ahmed Abdullah, alias Abu Muhammad Al-Masri, was gunned down in Tehran on August 7, 2020, along with his daughter, the widow of Hamza Bin Laden. Iran initially sought to obfuscate the identity of the slain al Qaeda operative, reportedly al Qaeda's second in command at the time, with official media organs claiming the victims were a Lebanese history professor affiliated with Hezbollah and his daughter. *See* **Exhibit 6.**

45.     Al-Masri ordered the al Qaeda bombings of U.S. embassies in Kenya and Tanzania on August 7, 1998. He was targeted for killing by two gunmen on a motorbike on the 22nd anniversary of those attacks. According to a senior U.S. official, Israeli agents acting at the behest of the U.S. carried out the assassination. Although

initially under house arrest, al-Masri had reportedly been living freely in an upscale Tehran suburb since 2015. Israeli media cited intelligence sources that Iran provided a permissive environment from which al-Masri planned operations against Israeli and Jewish targets around the world.

46.     From its Iranian safe haven, al Qaeda members have planned terrorist operations that have killed dozens of people, including Americans. From Iran, Saif al-Adl helped relay orders from Ayman al-Zawahiri to Tanzim Qaedat fi al-Jazeeratul Arab (the al Qaeda Organization on the Arabian Peninsula).

47.     For example, on May 12, 2003, al Qaeda commandos attacked residential compounds housing foreign workers in Riyadh, Saudi Arabia, killing 35 people, including eight Americans. The attacks were reportedly planned and ordered by al Qaeda operatives in Iran, specifically Saif al-Adel and Sa'ad bin Laden. Through the U.N., the U.S. conveyed its "deep concern that individuals associated with al Qaeda have planned and directed the attack in Saudi Arabia from inside Iran."

48.     According to intelligence sources, Sa'ad was also involved in planning the April 11, 2002, suicide bombing of a Tunisian synagogue on April 11, 2002, that left 21 dead.

49.     An intercepted letter reportedly sent to Iran's Islamic Revolutionary Guard Corps (IRGC) in 2008 by Ayman al-Zawahiri, the al Qaeda leader who was killed in a U.S. drone missile strike in Afghanistan on July 31, 2022, revealed an even deeper relationship between Iran and al Qaeda than previously thought. The correspondence was sent after the September 19, 2008 attacks on the American embassy in Sana'a, Yemen, which killed 19 people. The Daily Telegraph states, "In the letter, al Qaeda's leadership

pays tribute to Iran's generosity, stating that without its 'monetary and infrastructure assistance' it would not have been possible for the group to carry out the terror attacks. It also thanked Iran for having the 'vision' to help the terror organization establish new bases in Yemen after al-Qaeda was forced to abandon much of its terrorist infrastructure in Iraq and Saudi Arabia." *See* **Exhibit 7.**

50.     Another prime example of the threat posed by al Qaeda's pipeline in Iran comes from an al Qaeda plot to derail a train going from New York to Toronto that was foiled in April 2013. After two of the terrorists had been arrested, Royal Canadian Mounted Police official James Malizia said, "the individuals were receiving support from al Qaeda elements in Iran." *See* **Exhibit 8.**

## V.  IRAN ACTED THROUGH ITS OFFICIALS, EMPLOYEES, OR AGENTS WHO WERE ACTING WITHIN THE SCOPE OF THEIR OFFICES, EMPLOYMENT, OR AGENCIES

51.     Following the U.S. invasion of Afghanistan, Iran provided safe haven to al Qaeda operative Abu Musab al-Zarqawi, who went on to establish al Qaeda in Iraq (AQI), an al Qaeda offshoot that went on to murder untold numbers of Iraqis and Americans.

52.     Zarqawi initially operated under the protection of the IRGC, a primary branch of Iran's armed forces, and its elite Quds Brigade (IRGC-QF). According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. While the Iranian regime eventually succumbed to U.S. pressure, forcing Zarqawi to leave Iran and arresting many of his personnel, the damage had already been done; Zarqawi's network was already rebuilt, even though the Iranian authorities could have prevented such an outcome at any time.

53.     Plaintiff respectfully requests that the Court follow the *Karcher v. Iran* decision, finding that Iran was liable for nearly all IED and EFP attacks on U.S. servicemembers in Iraq. *See Karcher v. Islamic Republic of Iran,* 1:16-CV-232, USDC for the District of Columbia. The *Karcher* court held a series of bellwether hearings on the topic of Iran's liability for IED and EFP attacks. Multiple experts testified that both EFP and non-EFP attacks could not have been conducted without the support of the IRGC and Quds Force. Expert witness Russel McIntyre testified, "It was in the latter half of 2004 that this Iranian assistance became manifest in improving the sophistication and lethality of the Special Groups' deployment of IEDs…." *See* **Exhibit 9**. McIntyre's expert report cited a previously classified December 2, 2004, UK Defense Intelligence Report, which noted: "Improvement in IED technology has been most significant in Shia areas since May [20]04, where technical progress has been made that we assess could only have been achieved through focused external assistance. We assess that this may be due to an influx of Lebanese Hizballah technology under Iranian sponsorship." *Ibid.*

54.     Acting through the IRGC-QF, Iran provided material support and resources for the IED attacks that resulted in Plaintiff Dennis Amrhein's injuries. In its conclusions, the McIntyre expert report summarizes the devastating consequences of Iran's role in targeting American servicemembers:

> What is clear, more than fifteen years after the invasion that overthrew Saddam Hussein's regime, is that American policy-makers greatly miscalculated in their assessment of Iran's objectives and capabilities in Iraq and vastly underestimated Iran's role in targeting American service members with a wide variety of surrogates and weapons. Although American decision-makers knew at an early stage that Iran's IRGC-QF was engaged in efforts to fund, train and instigate Shi'a armed groups, and many glaring warning signs even made it into public view, no coherent strategy was ever formed to address the threat, no tactical adjustments meaningfully blunted the Iranians' ability to inflict losses on American

service members, and few senior Iranian or Hezbollah operatives paid any price for their actions. Instead, hundreds of American soldiers and civilians were murdered, and thousands wounded, in Iraq at the direction of the IRGC-QF and Hezbollah, with virtual impunity. *See* **Exhibit 9**.

## VI. IRANIAN MATERIAL SUPPORT AND RESOURCES PROVIDED TO AL QAEDA CAUSED THE PLAINTIFF'S INJURIES AND DAMAGES

55.     28 U.S.C. § 1605A(a) includes a proximate causation element. *See Ben-Rafael v. Islamic Republic of Iran,* 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). The causation element of § 1605A does not require that Plaintiffs prove that the injury would not have happened but for the defendant's actions. *Kilburn,* 376 F.3d at 1128. Neither must they establish a close temporal or spatial proximity between the harm and the action that caused it. *Rux v. Republic of Sudan,* 461 F.3d 461, 473 (4th Cir. 2006), citing *Kilburn,* 376 F.3d at 1128.

56.     Rather, proximate cause under §1605A is established by demonstrating "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens v. Republic of Sudan,* 864 F.3d 751, 794 (D.C. Cir. 2017); *Valore v Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010). The mere fact that al Qaeda and its operatives may have themselves been "but for" causes of the Plaintiff's injuries does not break the causal chain of Iran's actionable conduct. "Such a case, in which application of a 'but for' standard to joint tortfeasors could absolve them all, is precisely the one for which courts generally regard 'but for' causation as inappropriate." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,* 894 F.3d 339, 346 (D.C. Cir. 2018) citing *Kilburn* 376 F.3d at 1129.

57.     Finally, proximate cause does not require the Plaintiff to show the

defendant specifically intended or directly advanced their injuries. *Owens,* 864 F.3d at 799; *Kilburn,* 376 F.3d at 1128-29. As the *Kilburn* court noted, material support is difficult to trace. 376 F.3d at 1128. Accordingly, the D.C. Circuit, in a unanimous decision by Judges Garland, Ginsburg, and then-Judge John Roberts, adopted a flexible standard for causation under the terrorism exception to jurisdictional immunity.[2] *Kilburn,* 376 F.3d at 1128-29. The Court noted that material support is difficult to trace. *Id.* at 1129 cf., *Boim v. Holy Land Foundation for Relief and Development,* 596 F.3d 685, 695-698 (7th Cir. 2008) (en banc) (finding causation and liability under the Anti-Terrorism Act against a U.S.-based organization that provided funds to Hamas, which killed an American teen-ager in a drive-by shooting).

58.　　In *Owens,* the D.C. Circuit held that proximate cause requires (a) that the defendant's actions must be a "substantial factor" in the sequence of events leading to the plaintiff's injury, and (b) that the injury must have been a reasonably foreseeable or anticipated consequence of the defendant's conduct. *Owens,* 864 F.3d at 794. Iranian material support was certainly a substantial factor in the sequence of events leading to the Terrorist Attacks on Dennis Amrhein.

59.　　Plaintiff has alleged and provided copious reports and evidence that Iran supported al Qaeda in Iraq, after the Iraq War, to destabilize the newly created provisional Government of Iraq and promote Iran's desire for a powerful Shia-controlled geopolitical alliance of Iraq and Iran. *See* **Exhibits 1-9.**

---

[2] *Kilburn* was decided under an earlier version of the terrorism exception that was then codified at 28 U.S.C. § 1605(a)(7). However, in *Owens,* 864 F.3d at 794, the D.C. Circuit reaffirmed *Kilburn's* analysis of the causation standard for the jurisdictional immunity exception and applied it to the current terrorism exception found in 1605A(a).

60.     The Terrorist Attacks on Plaintiff Dennis Amrhein were also both a reasonably foreseeable and anticipated consequence of Iran's policy of providing material support to al Qaeda in Iraq. The very purpose of Iran's support was to destabilize Iraq and start a fresh civil war by creating a Sunni power vacuum and filling the vacuum with Shiite-friendly and Iranian-aligned terrorist groups. *See* **Exhibits 1-9.**

61.     This intent, coupled with the extensive efforts made by Iran through its officials, employees and agents to maintain al Qaeda as a menacing terrorist organization (as discussed at length above) easily demonstrates that the Terrorist Attacks on Dennis Amrhein were a reasonably foreseeable and anticipated consequence of Iran's conduct.

## VII. IRAN'S SUPPORT OF AL QAEDA ESTABLISHES LIABILITY IN THE INSTANT CASE

62.     The agreements between Iran and al Qaeda (and Iran's comprehensive involvement with al Qaeda's operations in Iraq and al Qaeda's terrorist activities) demonstrate that Iran was not only a supporter of al Qaeda, but that the two were co-conspirators.

63.     "The very sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts." *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) (quoting *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 84 (D.D.C. 2006) and *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 27 (D.D.C. 1998)) (quotation marks omitted)). *See also Acosta v. Islamic Republic of Iran,* 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) (same). Because Iran and al Qaeda were co-conspirators, Iran is liable for providing material support and resources for the Terrorist Attacks.

64.     "Personal jurisdiction over a foreign state shall exist as to every claim for

relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *See S & Davis Int'l, Inc. v. Yemen,* 218 F.3d 1292 (11th Cir. 2000) (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process); *see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.,* 863 F.3d 96 (2d Cir. 2017). "Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state are required." *See Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1553 (11th Cir. 1993) (citations omitted).

65.     Moreover, every federal court of appeals to have addressed the issue has held that "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 87 (D.C. Cir. 2002) (foreign states are not "persons" entitled to due process); *see also, Abelesz v. Magyar Nemzeti Bank,* 692 F.3d 661, 694 (7th Cir. 2012) (same); *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic,* 582 F.3d 393, 399 (2d Cir. 2009) (same); cf., *People's Mojahedin Org. of Iran v. United States Dep't of State,* 182 F.3d 17, 22 (D.C. Cir. 1999) ("No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy."). The Eleventh Circuit has not expressly held whether foreign states have due process rights. For example, in *S & Davis Int'l,* 218 F.3d, the court of appeals found it unnecessary to address the question because due process requirements were met.

66.     Plaintiff asks the Court to follow the rulings of the Second, Seventh and District of Columbia Circuits and hold that the personal jurisdiction inquiry as to foreign

state defendants does not require due process analysis. However, even if a foreign state is deemed a "person" for purposes of due process analysis, "a foreign state that sponsors terrorist activities which causes the death or personal injury of a United States national will invariably have sufficient contacts with the United States to satisfy Due Process." *See Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 23 (D.D.C. 1998).

67.     As recounted in Plaintiff's motion for clerk's entry of default, service upon Iran was made properly under 28 U.S.C. § 1608(a)(4). The Defendant was served the summons, complaint, coversheet, notice of suit and translations in accordance with the FRCP. As of this date, Defendant has refused to defend the instant case or deny its liability for the injuries suffered by Dennis Amrhein.

## VIII. PLAINTIFF'S SUBSTANTIVE CLAIMS AGAINST IRAN

68.     The Plaintiff's substantive claims arise primarily under the FSIA's statutory cause of action for state sponsorship of terrorism. *See Original Complaint,* page 9, item 28, line 4; 28 U.S.C.§ 1605A(c). "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *See Fritz v. Islamic Republic of Iran,* 2018 U.S. Dist. LEXIS 130008 (D.D.C. 2018), quoting, *Foley v. Syrian Arab Republic,* 249 F. Supp. 3d 186, 205 (D.D.C. 2017). Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz,* 2018 U.S. Dist. LEXIS at *86.

69.     In support of this Motion, Plaintiff submits a proposed order, supported by a verified declaration and other exhibits documenting all facts necessary to support a damages award and entry of judgment therewith. Plaintiff asks the Court to follow the

precedent in *Fritz* and *Foley* and provide the Plaintiff relief via an award of compensatory damages.

70.     A Federal Court awarding compensatory damages in a wrongful death claim may refer to State-level jury verdicts to establish the range for an award. Plaintiff will ask the Court to rely on prior Federal precedent for personal injury claims due to terrorist attacks and recent State-level jury verdicts for traumatic brain injury. *See Braun,* 228 F. Supp. 3d at 85; *Heiser v. Islamic Republic of Iran,* 466 F. Supp. 229, 269 (D.D.C. 2006); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 85 (D.D.C. 2010).

## IX. PLAINTIFF'S REQUESTED DAMAGES

### D.   Federal Precedent for Damages due to Terrorist Attacks

71.     The Plaintiff, Dennis Amrhein, is requesting compensatory damages for the injuries he suffered as a result of multiple IED blasts from July 2005 to March 2006. Other Federal Courts have awarded compensatory damages to survivors of terrorist attacks organized by the Defendant Islamic Republic of Iran. *See Dammarell, et al. v. Islamic Republic of Iran, et al.,* Civ. A. No. 01-2224(JDB), 2006 U.S. Dist. LEXIS 63263 (D.D.C. 2006 Sept. 7, 2006). This Honorable Court has also awarded compensatory damages to survivors of terrorist attacks organized by Iran.[3]

### E. State Precedent for Personal Injury (TBI)

72.     Plaintiff also asks the Court to consider recent Texas jury awards as a reference point for an appropriate compensatory damages award on a case that involves traumatic brain injury. Plaintiff cites the jury verdict in *Robinson v. West Star*

---

[3] *See White v. Islamic Republic of Iran,* 1:21-CV-86, USDC, Southern District of Texas; *Herrick v. Islamic Republic of Iran,* 1:21-CV-168, USDC, Southern District of Texas; *Espitia v. Islamic Republic of Iran,* 1:21-CV-123, USDC, Southern District of Texas.

*Transportation,* where the jury awarded the plaintiff compensatory damages of $5.3 Million. In 2015, The Texas Court of Appeals for the Seventh District affirmed the judgment and ruled that the award amount was appropriate. *See West Star Transportation Inc. v. Charles and Cherie Robinson,* Court of Appeals, Seventh District of Texas, No. 07-13-00109-CV (dec'd 1/23/15).

73.     The injuries in *Robinson* were traumatic brain injury with no loss of limbs or paraplegia. The breakdown in *Robinson* was as follows: $300,000 for past physical pain and mental anguish; $700,000 for future physical pain and mental anguish; $168,540 for past loss of earning capacity; $243,184 for future loss of earning capacity; $5,000 for past physical impairment; $378,718 for past medical care; $3,337,857 for future medical care, and $400,000 to his wife for loss of consortium.

74.     Plaintiff cites the verdict in *Montoya v. Williams,* et al, issued on February 4, 2015, where the 70th State District Court of Ector County, Texas, found the Defendant liable in the amount of $3,655,130 for the plaintiff's mild traumatic brain injury disorder that included seizures. *See Cindy Montoya v. Billy Duane Williams and Advanced Simulation Technologies, Inc.,* 70th District Court of Ector County, Texas, No. A-134,684 (dec'd 2/4/2015).

75.     Plaintiff also cites the verdict in *Menchaca v. National Trampoline Entertainment Center,* issued on February 26, 2016, where a jury for the 334th State District Court of Harris County, Texas, found the Defendant liable in the amount of $5,000,000 for compensatory damages and $6,000,000 for punitive damages as a result of the defendant's negligence that caused the plaintiff's traumatic brain injury. *See Menchaca v. National Trampoline Entertainment Center,* 334th District Court of Harris

County, Texas, No. 201407366 (dec'd 2/26/2016).

76.     In the three Texas cases cited by Plaintiff—*Robinson, Montoya,* and *Menchaca*—the injuries are consistent with the injuries incurred by Dennis Amrhein in the instant case: traumatic brain injury, PTSD, difficulty concentrating, problems with short-term memory, and dizziness. *See* **Exhibit 10.**

77.     Plaintiff asks the Court to follow the Texas precedents on compensatory damages due to traumatic brain injury (TBI).

F. Plaintiff's Requested Compensatory Damages

78.     The decisions rendered in *Robinson, Montoya,* and *Menchaca* were not considered made by *runaway juries*. Nor was any allegation or argument made that the verdicts were excessive. Compared with the instant case, the Plaintiff's damages are higher because Plaintiff Dennis Amrhein suffered permanent physical and psychological injuries from multiple Terrorist Attacks and IED blasts that continue to cause lasting and severe pain and suffering nearly twenty years after the Terrorist Attacks. Mr. Amrhein's permanent physical and psychological injuries include traumatic brain injury; permanent memory loss; loss of short-term memory; difficulty learning new tasks; speech impairments; personality and behavioral changes; loss of reasoning ability; loss of spatial perception; difficulty walking; dizziness; diminished hearing; severe tinnitus; severe bilateral hip pain; severe back pain; severe PTSD; and suicidal ideations.

79.     Plaintiff requests Damages in the following amount:

        a)      $7,500,000 compensatory damages to Dennis Amrhein.

80.     Plaintiff requests that the Court follow the *Dammarell, Heiser,* and *Braun* decisions, as well as this Honorable Court's decisions in *White, Herrick,* and *Espitia.*

Plaintiff also notes that the Court may grant this motion without a hearing. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 242 (2d Cir. 1994).

## PRAYER FOR RELIEF

THEREFORE, Mr. Amrhein respectfully requests that the District Court enter a Judgment against Defendant Islamic Republic of Iran in accordance with this Motion, Proposed Order, and Judgment herein.

DATED: APRIL 26, 2024      Respectfully submitted,

By:    ***/s/ R. Bruce Tharpe***
R. Bruce Tharpe

**LAW OFFICE OF**
**R. BRUCE THARPE, PLLC**
PO Box 101
Olmito, TX 78575
(956) 255-5111 (Tel)

ATTORNEY OF RECORD FOR
PLAINTIFF DENNIS AMRHEIN

<u>CERTIFICATE OF SERVICE</u>

I, R. Bruce Tharpe, do hereby certify that on April 26, 2024, this Motion was served on all parties of record via the SDTX_USDC electronic case filing system. Additionally, a copy of this filing was mailed to Defendant ISLAMIC REPUBLIC OF IRAN at the Ministry of Foreign Affairs, Islamic Republic of Iran, Imam Kkomeni St, Imam Khomeni Sq, Tehran, Iran 11369114811, via United States Postal Service International Registered Mail, Return Receipt requested.

***/s/ R. Bruce Tharpe***
R. Bruce Tharpe

ATTORNEY OF RECORD FOR
PLAINTIFF DENNIS AMRHEIN