United States District Court
Southern District of Texas
**ENTERED**
May 13, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DENNIS AMRHEIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:22-CV-076 |
| | § | |
| ISLAMIC REPUBLIC OF IRAN, | § | |
| | § | |
| Defendant. | § | |

## <u>ORDER AND OPINION</u>

In 2005 and 2006, Dennis Amrhein served on active duty in Iraq with the United States Army. On three separate occasions, al Qaeda operatives detonated an improvised explosive device (IED) to attack Amrhein's units, causing him to suffer severe and permanent injuries.

Amrhein filed this action against the Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, alleging that Iran is liable for the injuries caused by the attack because of the state's material support of al Qaeda's terrorist activity in Iraq.

After Amrhein perfected service under the Hague Convention, Iran failed to file a responsive pleading. The Clerk of Court entered default, and the Court set a deadline for Amrhein to submit evidence in support of a motion for default judgment. He has done so. (Motion, Doc. 33) Based on the record and the applicable law, the Court finds that Amrhein has provided satisfactory evidence to support default judgment.

## I.    Factual Findings[1]

### A.  Evidentiary Standard

Federal Rule of Civil Procedure 55 governs the entry of default judgment, which represents a "drastic remedy" available only where "the adversary process has been halted because of an

---

[1] The Court bases its factual findings on the evidence that Amrhein submits and of which the Court can take judicial notice.

essentially unresponsive party." *Sun Bank of Ocala v. Pelican Homestead and Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (citations omitted).  The district court in its discretion determines whether a default judgment is appropriate. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

Under the FSIA, "[n]o judgment by default shall be entered by a court . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide", and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)); *see also Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (citations omitted) ("A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true.").[2]  A court may not "simply accept a complaint's unsupported allegations as true"; the plaintiff must provide some form of evidentiary support. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citations omitted).  Plaintiffs may satisfy their burden of production through the submission of documentary evidence, such as detailed affidavits or declarations describing the nature and extent of their damages.  *Id.* (accepting uncontroverted evidence in the form of affidavits as true); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011).  Additionally, a court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence", although the court must "reach [its] own, independent findings

---

[2] The Fifth Circuit does not appear to have considered a matter under the state-sponsored-terrorism exception within the FSIA.  The absence of such caselaw stems, at least in part, from the venue provision within 28 U.S.C. § 1391(f) for actions against foreign states.  Under that provision, most lawsuits under Section 1605A would typically fall within Section 1391(f)(4), which provides for venue in the United States District Court for the District of Columbia.  Accordingly, that judicial district provides most of the caselaw regarding the state-sponsored terrorism exception.  But Section 1391(f) is permissive and not exclusive—i.e., a state action "may be brought" in four defined venues—and here, venue is proper in the Southern District of Texas, Brownsville Division.  Given the absence of Fifth Circuit authority on this issue, the Court looks to the decisions from the District of Columbia as persuasive authority.

of fact." *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010)).

In the current matter, Amrhein submitted seventeen exhibits with his Motion, including two United States Department of State annual reports from 2010 and 2019, news articles detailing Iran's connection to al Qaeda's terrorist operations, a brief by United Against Nuclear Iran, as well as his own declaration.

**B. Iran's Support of Terrorism in Iraq**

Since 1984, the United States Department of State has designated Iran as a state sponsor of terrorism. (State Dep't Country Reports on Terrorism 2010, Doc. 33–3, 3)  The State Department labels Iran as "the world's worst state sponsor of terrorism", based on the Iranian regime's extensive support of various terrorist organizations, including al Qaeda, that are hostile to the United States and its allies. (State Dep't Country Report on Terrorism 2019, Doc. 33–1, 4) The United States has confirmed that the Iranian Ministry of Intelligence and Security ("MOIS") "provided money and weapons to [al Qaeda] in Iraq", as well as facilitated the organization's operations in Iraq through the provision of travel documents. (United Against Nuclear Iran Brief, Doc. 33–5, 11)  Iran's material support of al Qaeda's operations in Iraq reaches back to the early 1990's, well before the attacks on Amrhein. (*Id*. at 14 )

After the United States invaded Afghanistan in 2001, Iran provided "safe haven" to several al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist who "initially operated under the protection of the IRGC and its elite Quds Brigade." (*Id*. at 10)  "According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq." (*Id*.)  In 2003 and 2004, Zarqawi became a leader of Sunni extremists and insurgent groups in Iraq, which he consolidated with his pre-existing terrorist group—Jama'at al-Tawhid wal-Jihad (the Organization of Monotheism and Jihad). (Leo Bradley Report, Doc. 34–3, 9)  In October 2004, he swore allegiance to Osama Bin-

Laden and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as al Qaeda in Iraq (AQI). (*Id.*)

"[AQI] presented a very serious threat to the post-2003 stability of Iraq", and combatting AQI attacks was a focus for United States military in the early years of the Iraqi invasion. (Russell McIntyre Report, Doc. 34–7, 14)  According to counter-terrorism expert Donald Barker, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." (Donald Barker Report, Doc. 34–4, 12; *see also* Kevin Lutz Report, Doc. 34–2, 5)  These attacks were referred to as the "insurgency." (Barker Report, Doc. 34–4, 13; *see also* Lutz Report, Doc. 34–2, 5)  Sunni groups and AQI were most active in western and northern Iraq and Baghdad. (Michael Oates Report, Doc. 34–5, 10)  Ramadi, where Amrhein was patrolling, is approximately 110 kilometers west of Baghdad.

In their attacks, insurgents typically used IEDs, a highly adaptable and relatively inexpensive type of weapon that proved "extremely effective in sowing chaos". (*Id.* at 18–19; Bradley Report, Doc. 34–3, 6) For those reasons, terrorist groups were able to utilize IEDs to cause thousands of deaths to United States military and civilians in the Iraqi region during the 2000s. (Id.) IEDs posed a growing threat to the United States military in Iraq, and the threat became so prevalent that in 2003, the military established an IED Task Force to counter the "rapidly expanding IED threat" in Iraq. (Lutz Report, Doc. 34–2, 4)  In response, the U.S military strengthened the  armoring of its vehicles. (*Id.* at 14, 23)

Iran commonly provided IEDs to terrorist cells in Iraq, both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the purpose of attacking United States servicemembers and further destabilizing the Iraqi region. (Leo Bradley Report, Doc. 34–3, 25; AEI Brief, Doc. 34–8, 22)  By "no later than early February [2004], a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 34–8, 22–23) "Some of AQI's trademark attacks included suicide bombings, house bombings—and [vehicle-borne IED] attacks." (Oates

Report, Doc. 34–5, 10) In the early 2000s, evidence suggested that Zarqawi was dispatching numerous suicide bombers throughout Iraq to orchestrate attacks with IED bombs, and that these kinds of weapons were being used in terrain that AQI controlled. (AEI Brief, Doc. 34–8, 23)

### C.  The Attacks on Amrhein

Amrhein survived three IED attacks during his tour of duty in Ramadi, Iraq.

In July 2005, while Amrhein patrolled on foot, an IED exploded nearby, knocking him unconscious for several minutes. (Amrhein Decl., Doc. 33–10, 2)  He suffered a concussion, hearing loss, and bruising on his back and limbs. (*Id*. at 2–3)  Four months later, Amrhein again served on foot patrol when an IED exploded near him, rendering him unconscious and inflicting injuries similar to those from the first attack. (*Id*. at 3)

In March 2006, Amrhein rode in a M1114 Up Armored Humvee on reconnaissance patrol. (*Id*. at 3)  An IED explosion disabled the vehicle and injured all of its occupants. (*Id*.)  Amrhein remained conscious after the attack, but received some medical care. (*Id*.)

The three explosions in a relatively brief time period resulted in severe injuries.  Medical professionals have diagnosed Amrhein with "indicators of traumatic brain injury; permanent memory loss; loss of short-term memory; difficulty learning new tasks; speech impairments; personality and behavioral changes; loss of reasoning ability; loss of spatial perception; difficulty walking; dizziness: severe bilateral tinnitus; damaged back; and complex PTSD." (*Id*.)  The complex PTSD manifests in several ways, including:

- Extreme paranoia;

- Obsessive trichotillomania, a hair-pulling disorder;

- Obsessive excoriation, a skin-picking disorder;

- Extreme nightmares and night terrors;

- Extreme emotional avoidance, resulting in an inability to resolve conflict in a healthy manner, leading to further conflict; and

- Suicidal ideations

(*Id.* at 3–4)  Amrhein uses hearing aids in both ears because of the hearing loss and suffers from "very severe, constant tinnitus." (*Id.* at 4)  He also endures pain in his limbs, hips, and back. (*Id.* at 3)

In light of these extensive injuries, the Department of Veterans Affairs classifies Amrhein at its highest disability rating. (*Id.* at 4)

### D.  Procedural History

Amrhein brings this lawsuit seeking compensatory damages for pain and suffering, economic loss and loss of income, and severe emotional distress and mental anguish, as well as the imposition of punitive damages. (Compl., Doc. 1, 22–23)  He perfected service on Iran under 28 U.S.C. § 1608(a)(3).  And in January 2024, the Clerk of Court entered default. (Entry of Default, Doc. 29)

Amrhein now moves for default judgment. (Motion, Doc. 33)

## II.   Analysis

In general, a foreign state is immune from a lawsuit for money damages in a United States federal court. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 3d 40, 53 (D.D.C. 2006).  The FSIA, however, contains an exception for state-sponsored terrorism.  This exception permits plaintiffs to sue a foreign state for damages caused by "an act of torture, extrajudicial killing . . . or the provision of material resources for such an act if such act or provision of material or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A.

A prima facie case under the state-sponsored-terrorism exception to the FSIA requires the plaintiff to demonstrate that:

1)   the foreign state defendant is designated as a state sponsor of terrorism when the original action was filed;

2)   the claimant is a national of the United States;

3)  the damages were caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for a terrorist attack;

4)  the act(s) are engaged in by an official, employee, or agent of the foreign state;

5)  while acting within the scope of the office, employment, or agency.

*Id.* Material support or resources refers to "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification . . . weapons, lethal substances, [and] explosives". 18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3). "[W]here a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute." *Rimkus*, 750 F. Supp. 2d at 182 (cleaned up); *see Valore v. Islamic Republic or Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010) ("[T]here is no but for causation requirement for claims made under the FSIA.") (cleaned up).  Rather, the plaintiff only needs to show that "a particular terrorist group committed the terrorist act", and that the foreign state generally sponsored that group such that the state "contributed to the group's ability to carry out the terrorist attack." *Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 153 (D.D.C. 2010).

**A.  Liability**

Based on the applicable law and the evidence presented with the Motion, the Court concludes that Amrhein has provided satisfactory evidence to establish a prima facie case under Section 1605A to support a default judgment.

The evidence easily satisfies the initial two elements.  First, since 1984, the United States has designated Iran as a state sponsor of terrorism.  Second, Amrhein is a United States citizen. As a result, Amrhein's entitlement to recovery turns on whether he has established the remaining three elements–i.e., does the evidence demonstrate a clear causal connection between Iran's state

action and the terrorist attacks that injured Amrhein?  The Court finds that he has demonstrated the requisite causation.

All three attacks on Amrhein involved an IED, which counter-terrorism and weapons experts agree was a weapon that AQI consistently used to carry out suicide bombings and attacks on United States servicemembers in Iraq. (Oates Report, Doc. 34–5, 11)

Iran commonly provided IEDs to terrorist cells in Iraq, both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the purpose of attacking United States servicemembers and further destabilizing the Iraqi region. (Bradley Report, Doc. 34–3, 25; AEI Brief, Doc. 34–8, 22)  By "no later than early February [2004], a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 34–8, 22–23)

The evidence also demonstrates that Iran provided material support specifically to AQI. The United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a "safe haven", as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq. (United Against Nuclear Iran Brief, Doc. 33–5; AEI Brief, Doc. 34–8, 17–36)  At the time of the attacks on Amrhein's unit, Iran was responsible for a significant portion of AQI's weapons arsenal, and would have been AQI's principal supplier of IEDs. (AEI Brief, Doc. 34–8, 23)

Armed by Iran, AQI consistently carried out attacks against United States servicemembers in Iraq, specifically in Baghdad and the western and northern regions of the country where Amrhein patrolled. (Oates Report, Doc. 34–5, 10; Amrhein Decl., Doc. 33–10, 2–3)  It is true that after the attacks on Amrhein's unit, no terrorist group claimed responsibility, and no investigation found definitive, direct evidence of AQI's involvement.  The evidentiary record, however, establishes that AQI regularly conducted terrorist attacks in the area with IEDs that Iran supplied. As a result, the Court concludes that the evidence satisfactorily demonstrates that Iran, through

various state officials and agents, contributed significantly to AQI's ability to orchestrate an attack with a weapon that could inflict severe injury on servicemembers on foot patrol, and that proved powerful enough to disable a heavily-armored Humvee, such as the one in which Amrhein performed reconnaissance patrol.

### B.  Damages

Amrhein seeks compensatory damages for pain and suffering, economic loss and loss of income, and severe emotional distress and mental anguish, as well as punitive damages to punish Iran for its support of terrorism in Iraq. (Compl., Doc. 1, 24)

Section 1605A(c) provides that victims of state-sponsored terrorism may recover money damages, including "economic damages, solatium, pain and suffering, and punitive damages." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017).  "To obtain compensatory damages in an FSIA case, a plaintiff 'must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate.'" *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012)).

Applying this analysis to the present case, the Court initially finds, for the reasons previously articulated in Part II.A, that Amrhein has satisfactorily shown that Iran's material support of AQI had the reasonably certain and intended consequence of causing the attacks on his unit and the resulting damages to him.  To determine a reasonable estimate of the resulting harm, the Court relies on Amrhein's declaration and prior awards for comparable injuries in other FSIA cases.

### 1.  Compensatory Damages

Amrhein alleges that "[t]he Terrorist Attack caused [him] severe injury, including: pain and suffering (past, present, and future); economic damages (past, present and future) and loss of income (past, present, and future); and severe emotional distress and mental anguish."

(Compl., Doc. 1, 22–23)  He requests compensatory damages of $7.5 million. (Motion, Doc. 33, 30)[3]

### a.  Pain and Suffering

Courts consider several factors when assessing a reasonable estimate of compensatory damages for the pain and suffering of terrorist-attack survivors.  Those factors include "the severity of pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (internal quotations omitted).  Under the FSIA, courts have applied a "baseline assumption [ ] that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012).  In *Davis*, the court reduced the baseline amount by over 50% because the terrorist-attack survivors suffered minor physical injuries, such as hearing loss and severe post-traumatic stress disorder.  *Id.* at 13.  In contrast, in *Valore*, the court increased the amount to $7.5 million where the victim suffered from burns covering 90% of his body and other "particularly horrendous physical injuries." 700 F. Supp. 2d at 84.

In the present case, the Court finds that the evidentiary record supports the $5 million baseline award.  Cumulatively, the attacks knocked Amrhein unconscious twice and caused him to suffer hearing loss, tinnitus, lower back injuries, and post-traumatic stress disorder. (Amrhein Decl., Doc. 33–10, 2–4)  In light of these extensive injuries, the Department of Veterans Affairs assessed Amrhein a 100% disability rating—the highest rating possible. (Amrhein Decl., Doc. 33–10, 4)

Almost eighteen years after the final attack, Amrhein continues to suffer.  In addition to ongoing physical pain, he describes symptoms of post-traumatic stress disorder, including psychological disorders, night terrors, and an ongoing inability to maintain interpersonal

---

[3] In his Complaint, Amrhein requests at least $10 million in compensatory damages.  In his Motion for Default Judgment, he reduces the request to $7.5 million.

relationships. (Amrhein Decl., Doc. 33–10, 3–4)  He demonstrated none of these behaviors before his deployment. (*Id*.)

Based on the significant injuries, both physical and otherwise, that the terrorist attacks caused Amrhein, the Court awards him $5 million in compensatory damages.

### b.  Economic Loss

Amrhein also requests damages for economic loss and loss of income.  Plaintiffs seeking such damages must "support the claim [ ] with competent evidence" demonstrating that the incident in question proximately caused the economic loss.  *Moradi*, 77 F. Supp. 3d at 71; *see also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 31 (D.D.C. 2011).  "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." *Oveissi*, 768 F. Supp. 2d at 31; *see also Braun*, 228 F. Supp. 3d at 83 (declining to award economic damages to plaintiffs who submitted insufficient evidence).

Amrhein presents no information regarding his salary at the time of the accident, the status of his disability benefits from Veterans Affairs, or his present-day earning capacity, depriving the Court of any basis on which to calculate the loss of earning capacity resulting from his injuries.  While the Court recognizes that the attack rendered Amrhein permanently disabled, and that he continues to incur medical costs related to his injuries, the Court lacks a sufficient basis on which to calculate the economic loss attributable to Iran's misconduct.

Due to the absence of satisfactory evidence, the Court awards no damages for economic loss or loss of income.

### 2.  Punitive Damages

Amrhein also requests punitive damages. (Compl., Doc. 1, 23)

"Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56

(D.D.C. 2012).  In FSIA cases, courts typically have evaluated the appropriateness of punitive damages based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008).  Where the plaintiff has established that a foreign state provided material support to a terrorist organization, these four factors strongly favor awarding punitive damages.  *See, e.g., Braun*, 228 F. Supp. 3d at 86.  For example, in *Oveissi,* the court awarded punitive damages based on its finding that Iran provided funding and resources to Hezbollah and MOIS to carry out a "horrific assassination". 879 F. Supp 2d at 55.  As to the first and second factors, the court emphasized that "[t]he nature of the defendants' act and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom." *Id.* at 56.  Regarding the third and fourth factors, the court found that "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism," supporting the award of $300 million in punitive damages to dissuade Iran from further sponsorship of terrorists.  *Id.* at 57.

Courts have taken at least three distinct approaches to determine the amount of a punitive-damages award under the FSIA.  First, several courts have estimated a foreign state's "annual expenditure on terrorism" and multiplied that figure by a factor between three and five.  *See Acosta*, 57 F. Supp. 2d at 31 (estimating Iran's annual expenditure on terrorism at between $50 and $150 million, and awarding $300 million in punitive damages); *Roth*, 78 F. Supp. 3d at 406 (applying a multiplier of three to an estimated annual expenditure of $37.5 million to award $112.5 million in punitive damages).  At the same time, under this approach, some courts have declined to multiply the estimated annual expenditures when the resulting amount would have exceeded $300 million.  *See Oveissi*, 879 F. Supp. 2d at 56–57 (reasoning that a $300 million punitive-damages award was consistent with similar FSIA cases); *Baker v. Socialist People's*

*Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011) ("[W]ith one exception, [this court has] never awarded an amount higher than $300 million in punitive damages against Iran.").

Other courts have awarded "punitive damages in an amount equal to the total compensatory damages awarded". *Moradi*, 77 F. Supp. 3d at 73 (awarding $10.168 million in compensatory damages, and the same amount as punitive damages); *see also Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014) (subsequent history omitted) (apportioning punitive damages among the plaintiffs according to their compensatory damages). The *Moradi* court distinguished the decisions that applied a multiplier calculation by explaining that the case before it concerned actions taken directly by Iranian authorities, and noted that the victim had survived the attack. 77 F. Supp. 3d at 73.

Finally, other courts have awarded a fixed amount of $150 million in punitive damages per affected family. *See Braun*, 228 F. Supp. 3d at 87 (concerning Iran's material support of Hamas, which in turn orchestrated a terrorist attack in Jerusalem by driving a car into a crowd of pedestrians); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (involving Syria's material support of AQI, which released a graphic video of the gruesome decapitation of two American citizens).

In the present matter, the Court finds that punitive damages should be awarded to further the goal of punishing Iran for its reprehensible support of AQI, and to deter it and other foreign sovereigns from supporting terrorist organizations in the future. The evidentiary record demonstrates that Iran's support of AQI foreseeably led to indiscriminate acts of violence and murder in Iraq, including the attack that injured Amrhein. Iran poured extensive resources into ensuring that AQI possessed sufficient materials to manufacture and place IEDs in Iraq, with the intent to kill and maim U.S. military personnel. The Court finds that an award of punitive damages is appropriate and necessary to punish Iran for its conduct and to deter it from similar future behavior.

Turning to the appropriate amount of punitive damages, the Court first notes that the evidentiary record contains no data regarding Iran's annual expenditures in support of terrorism, or of its wealth.  Decisions from other cases involving Iran provide a range of punitive damages previously imposed against that country, but those cases generally involved more robust evidentiary records.  The Court recognizes that punitive damages, meant to punish and deter the defendant, should typically turn in large part on the particular defendant's wealth, so as to provide a meaningful deterrent.  But in the current matter, such a measure proves difficult, if not impossible.  As a result, the Court will base the award of punitive damages on its award of compensatory damages, but with a five-fold multiplier to increase the deterrent impact.  Based on this approach, the Court awards $25 million in punitive damages to Amrhein.[4]

### 3. Attorney's Fees

In his complaint, Amrhein seeks attorney's fees. (Compl., Doc. 1, 23)

Section 1605A itself provides no basis for such an award, and the Court is not aware of another statute that would support recovery of attorney's fees in an action under the FSIA. *See Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020) ("[T]he Court is not aware of any statutory or other basis for the award of attorney's fees".); *see also Selig v. Islamic Republic of Iran*, No. 1:19-CV-02889-TNM, 2021 WL 5446870, at *26 (D.D.C. Nov. 22, 2021) (denying the request for attorney's fees because the plaintiffs did not provide any basis for the request or information regarding the fees and costs sought); *Aceto v. Islamic Republic of Iran*, No. CV 19-464 (BAH), 2020 WL 619925, at *23 (D.D.C. Feb. 7, 2020) (same).

Because there is no statutory basis for ordering Iran to pay Amrhein's attorney's fees, the request is denied. *See Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) ("Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.").

---

[4] This award is also consistent with the Supreme Court's guidance that when reviewing a punitive damages award, due process warrants the consideration of, among various factors, the disparity between the compensatory and punitive damage awards.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

### III.     Conclusion

For the reasons previously explained, it is:

**ORDERED** that Plaintiff Dennis Amrhein's Motion for Default Judgment (Doc. 33) is

**GRANTED IN PART AND DENIED IN PART,** as explained in this Order and Opinion.  The

Court will issue a Final Default Judgment in accordance with this Order and Opinion.

It is also **ORDERED** that Plaintiff Dennis Amrhein serve a copy of this Order and Opinion

on Defendant Islamic Republic of Iran consistent with the requirements of 28 U.S.C. § 1608(e).

Signed on May 13, 2024.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge